**EAST HIGH GAY/STRAIGHT ALLIANCE, an unincorporated association; Ivy Fox, a minor, by and through her mother and next friend, Kay Kosow Fox; Keysha Barnes, a minor by and through her father and next friend, James Barnes; and Leah Farrel, by and through her mother and next friend, Kelly Fogarty, Plaintiffs,**

v.

**BOARD OF EDUCATION OF SALT LAKE CITY SCHOOL DISTRICT, a body corporate of the State of Utah; Darline Robles, Superintendent of Salt Lake City School District, in her official capacity; and Cynthia Seidel, Assistant Superintendent, in her official capacity, Defendants.**

No. CIV. 2:98–CV–193J.

United States District Court,
D. Utah,
Central Division.

Oct. 6, 1999.

Defense and Educ. Fund, New York City, Jon W. Davidson, Lamboda Legal Defense and Educ. Fund, Los Angeles, CA, Daniel Slaughter, Heller Ehrman White & McAuliffe, Kathryn D. Kendell, NCLR, San Francisco, CA, for plaintiffs.

Dan R. Larsen, Elizabeth King, Assist. Utah Attorneys Gen., Jan Grah, Utah Atty. Gen., Salt Lake City, UT, for defendants.

## MEMORANDUM OPINION AND ORDER

JENKINS, Senior District Judge.

On February 20, 1996, the Board of Education of the Salt Lake City School District adopted a formal written policy concerning student organizations:

> The Board of Education of Salt Lake City School District desires to promote and advance curriculum related student clubs. However, the Board does not allow or permit student groups or organizations not directly related to the curriculum to organize or meet on school property. It is the express decision of the Board of Education of Salt Lake City School District not to allow a "limited open forum" as that is defined by the Federal Equal Access Act, 20 U.S.C. § 4071.

(Pl.Ex. 112, annexed to Second Declaration of David S. Buckel, filed April 6, 1999 (dkt. no. 118).)

This written policy has been implemented by school administrators through a process that requires prior review and approval of every student club or group that seeks to meet on school premises during non-instructional time and to use school facilities to promote its activities.

Plaintiffs complain that as a "non-curricular" group, they have been denied the opportunity to meet on school premises at East High School during non-instructional time (*e.g.*, during the lunch hour), and have been denied access to facilities such as bulletin boards, the school PA system, and

Stephen C. Clark, American Civil Liberties of Utah Foundation, Inc., Salt Lake City, UT, Kelly M. Evans, American Civil Liberties Union, San Francisco, CA, Marlin G. Criddle, Laura M. Gray, Salt Lake City, UT, David Buckel, Lamboda Legal

closed circuit television to promote their organization and its activities, while other purportedly "curriculum related" groups have continued to meet, conduct activities and use school facilities. Plaintiffs' group has been excluded from "Club Rush" and "Spring Fest" and the school yearbook at East High School. (Second Amended Complaint, filed February 11, 1999 (dkt. no. 102), at 12–13 ¶ 34.) Plaintiffs seek access to school facilities to better reach students who need support, to promote awareness and acceptance, and to feel like "citizens of equal status."

On March 4, 1999, both plaintiffs and defendants, asserting an absence of disputed material facts, filed motions for summary judgment. On April 6, 1999, at the time they filed their response to defendants' motion, plaintiffs filed an additional cross-motion for partial summary judgment on their First Amendment claims. On April 15, 1999, reply memoranda were filed in support of the two original motions.

On April 16, 1999, the court heard these motions. Steven C. Clark, Jon W. Davidson, David S. Buckel and Laura M. Gray appeared on behalf of the plaintiffs; Dan R. Larsen and Elizabeth King appeared for the defendants. Following argument by counsel, the court took the matter under advisement.

Since the hearing, both sides have filed additional papers: Plaintiffs sought and received leave to file a supplemental memorandum in support of their motions, which they filed on May 21, 1999, together with the Declaration of Steven C. Clark. Defendants filed a supplemental response on June 11, in answer to which plaintiffs filed objections on June 15 and sought further leave to file supplemental briefing.

Both sides raise important, subtle and challenging issues—issues that demand thoughtful resolution. At the outset, however, we must parse the various arguments to reach the genuine question that lies at the core of the controversy.

# I

## The First Amendment

Our search for the question begins with the Constitution. The First Amendment to the United States Constitution declares that "Congress shall make no law ... abridging freedom of speech." This limitation on the power of government, absolute by its literal terms, we read to embrace all forms of human expression and communication, even silence. The First Amendment protects the right of the speaker to speak. It likewise protects the right of the listener to hear.

The First Amendment draws no distinctions among ideas and does not prefer one viewpoint over another. As scholar Harry Kalven, Jr. suggests, *In America there is no heresy, no blasphemy,* and Americans share in a consensus that the state may not suppress an idea or an opinion simply because it is, or is believed to be, false. Harry Kalven, Jr., *A Worthy Tradition: Freedom of Speech in America* 7, 11–13 (1988) (emphasis in original). The First Amendment strictly limits any conduct by government that seeks to control or restrict the *content* of human expression, or to favor or condemn a particular opinion or point of view. In a very real sense, the First Amendment maps an expanse of sacred ground—ground upon which ideas may be expressed and exchanged free from intrusion or restriction by the power of government—because we recognize that "[f]reedom of expression is the well-spring of our civilization." *Dennis v. United States,* 341 U.S. 494, 550, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (Frankfurter, J. concurring in the judgment).

The First Amendment's guarantee of freedom of expression finds application to the conduct of state and local governments—including public school boards—by way of the Due Process Clause of the Fourteenth Amendment. *See West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("The Fourteenth Amendment,

as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted.") The Board of Education of the Salt Lake City School District, no less than the Congress itself, remains bound by that guarantee and at all times must act within its constraints. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Comm. School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Whatever forum the Board may create for students' free expression of ideas, it may not pick and choose among the ideas or viewpoints that find expression in that forum. The Constitution commands otherwise.

In *Kingsley Int'l Pictures Corp. v. Regents of University of State of New York*, 360 U.S. 684, 688–89, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959), the Court rejected the contention that a State may refuse to permit expression because that expression "actively portrays a relationship which is contrary to the moral standards, the religious precepts, and the legal code of its citizenry." As the Court explained, "This argument misconceives what it is that the Constitution protects. Its guarantee is not confined to the expression of ideas that are conventional or shared by a majority."

The law of our Constitution shares the view expressed long ago by Benjamin Franklin: "both Sides ought equally to have the Advantage of being heard by the Publick; and that when Truth and Error have fair Play, the former is always an overmatch for the latter: ..." Benjamin Franklin, *An Apology for Printers*, THE PENNSYLVANIA GAZETTE, June 10,

1731, *reprinted in* J.A. Leo Lemay, *Franklin* 172 (The Library of America 1987).[1] The First Amendment protects the expression of all viewpoints, regardless of either their popularity or lack of general acceptance, or even the fears that particular opinions may engender. "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears." *Whitney v. People of California*, 274 U.S. 357, 376, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J. concurring).

Nevertheless, not every public building or publicly accessible place need serve as an open and public forum for the expression of any and all ideas. *See, e.g., International Society for Krishna Consciousness v. Lee*, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (airport terminal not a public forum); *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (postal mailbox not a public forum); *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (Fort Dix not a public forum); *Lehman v. Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (public transit system bus not a public forum). "The existence of a right of access to property and the standards by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

■ As has traditionally been the case with public parks, streets, or sidewalks, government may designate a facility for the full range of free expression without

---

1. Accord, *Dennis v. United States*, 341 U.S. at 550, 71 S.Ct. 857 (Frankfurter J. concurring in the judgment):

The history of civilization is in considerable measure the displacement of error which once held sway as official truth by beliefs which in turn have yielded to other truths. Therefore the liberty of man to search for truth ought not to be fettered, no matter what orthodoxies he may challenge. Liberty of thought soon shrivels without freedom of expression. Nor can truth be pursued in an atmosphere hostile to the endeavor or under dangers which are hazarded only by heroes.

limitation as to subject matter, creating what the Court has termed a *public forum*.[2] *See Arkansas Educational Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998); *Perry Education Ass'n*, 460 U.S. at 45–46, 103 S.Ct. 948; *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1286 (10th Cir.1999). "The government can exclude a speaker from a traditional public forum 'only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" *Forbes*, 523 U.S. at 677, 118 S.Ct. 1633 (quoting *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)).

■ Government may also determine the purpose of a particular public building or facility, and in so doing, may proscribe all expression on the premises,[3] or may drastically limit expression in furtherance of that purpose. Doing so creates what the Supreme Court calls a *nonpublic forum*. *Perry Education Ass'n*, 460 U.S. at 46, 103 S.Ct. 948; *International Society for Krishna Consciousness v. Lee*, 505 U.S. at 678, 112 S.Ct. 2701; *Hawkins*, 170 F.3d at 1287. Government may restrict access to a nonpublic forum by making "distinctions in access on the basis of subject matter and speaker identity", *Perry Education Ass'n*, 460 U.S. at 49, 103 S.Ct. 948, "'as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Forbes*, 523 U.S. at 677–78, 118 S.Ct. 1633 (quoting *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439 (internal quotation marks omitted)). A nonpublic forum generally is created when government "allows selective access for individual speakers rather than general access for a class of speakers." *Id.* at 679, 118 S.Ct. 1633.

■ However, government need not choose one or the other—public forum or nonpublic forum. Consistent with the purpose of a particular building or facility, government may allow free expression concerning a defined or limited subject matter while at the same time excluding expression concerning other subjects, regardless of viewpoint.[4] This *limited public forum* allows for the expression of all viewpoints so long as the content of the expression falls within the *permissible subject matter* of the forum. *Perry Education Ass'n*, 460 U.S. at 45–49, 103 S.Ct. 948. "To create a forum of this type, the government must intend to make the property 'generally available' ... to a class of speakers." *Forbes*, 523 U.S. at 678, 118 S.Ct. 1633 (citation omitted). Government may thus designate "a class of speakers" and thereby select the general subject matter of a limited public forum, but it may not sit in judgment upon particular viewpoints expressed on that subject matter.[5] "If the government excludes a

2. "Quintessential traditional public fora are streets, sidewalks, and parks, for they 'have immemorially been held in trust for the use of the public, and time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1286 (10th Cir.1999) (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). *See also Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980).

3. Some government facilities are "not fora at all." *Forbes*, 523 U.S. at 677, 118 S.Ct. 1633 (citation omitted).

4. Where the property has been "opened for use by the public as a place for expressive activity," termed a *designated public forum*, "content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry Education Ass'n*, 460 U.S. at 46, 103 S.Ct. 948 (citing *Widmar*, 454 U.S. at 269–70, 102 S.Ct. 269).

5. For example, in *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273 (10th Cir.), *cert. denied*, 519 U.S. 949, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996), the city permitted its senior citizen centers to host classes on the Bible from a literary, philosophical, and historical perspective, but prohibited instruction from a sectarian or religious viewpoint. The

speaker who falls with *the class to which a designated public forum is made generally available*, its action is subject to strict scrutiny." *Forbes*, 523 U.S. at 677, 118 S.Ct. 1633 (emphasis added & citations omitted). Where, for instance, a state university or public school makes its facilities generally available for the activities of student groups, it has designated those facilities as a "limited public forum" and generally cannot discriminate among those groups because of their content or subject matter. *See Widmar v. Vincent*, 454 U.S. 263, 267–70, 276–77, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (state university may not exclude student group desiring to use university facilities for religious worship).

 Where government designates either a limited public forum or a nonpublic forum,[6] it may set restrictions on speaker identity and subject matter "if the distinctions drawn are reasonable in light of the purpose served by the forum," *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439, and may impose reasonable restrictions on the time, place and manner of expression as well. *See Perry Education Ass'n*, 460 U.S. at 46, 103 S.Ct. 948. Regardless of the designated type of forum, however, restrictions on expression that seek to suppress a particular speaker or viewpoint remain subject to strict judicial scrutiny,[7] at least so long as that speaker or viewpoint fall within the permissible subject matter of expression within the forum. Even in a nonpublic forum, restrictions on expression cannot be sustained where they represent " 'an effort to suppress expression merely because public officials oppose the speaker's view.' " *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439 (quoting *Perry Education Ass'n*, 460 U.S. at 46, 103 S.Ct. 948).

## II

### The Equal Access Act

With this constitutional framework as background, Congress enacted the Equal Access Act, 20 U.S.C.A. § 4071 (1990), to extend and expand the law's protection of students' freedom of expression by outlawing discrimination on the basis of viewpoint, opinion, or belief:

It shall be unlawful for any public secondary school which receives Federal financial assistance and *which has a limited open forum* to deny equal access or a fair opportunity to, or discriminate against any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

court of appeals held that in relation to the subject matter permitted in that forum, exclusion of a church film which advocated adopting Christianity as one's religion constituted viewpoint discrimination in violation of the First Amendment. *Id.* at 1279. In that instance, the forum's permissible subject matter, *viz.*, study of the Bible, was clearly defined.

**6.** *Forbes* explains "the distinction between 'general access,' . . . which indicates the property is a designated public forum, and 'selective access,' which indicates the property is a nonpublic forum."

On one hand, the government creates a designated public forum when it makes its property generally available to a certain class of speakers, as the university made its facilities generally available to student groups in *Widmar*. On the other hand, the government does not create a designated

public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, "obtain permission," . . . to use it.

523 U.S. at 679, 118 S.Ct. 1633(citations omitted).

**7.** *See, e.g., United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. at 132, 101 S.Ct. 2676 ("To be sure, if a governmental regulation is based on the content of the speech or the message, that action must be scrutinized more carefully to ensure that communication has not been prohibited " 'merely because public officials disapprove the speaker's view.' " (quoting *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 536, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (quoting *Niemotko v. Maryland*, 340 U.S. 268, 282, 71 S.Ct. 325, 95 L.Ed. 267 (1951) (Frankfurter, J. concurring in the result))).

20 U.S.C.A. § 4071(a) (emphasis added). Congress thus sought "to prohibit the denial of noncurricular student groups' meetings on the basis of subject matter, namely as to religious, political, philosophical, or other content of the speech." *Student Coalition for Peace v. Lower Merion School Dist. Board of School Directors*, 633 F.Supp. 1040, 1043 (E.D.Pa.1986). In so doing, Congress re-emphasized the importance of governmental neutrality in any public secondary school forum whose permissible subject matter embraces matters non-curricular in nature.

■ If a public school or university wishes to avoid the issues of free access by student groups that may arise under the Equal Access Act, it must avoid creating a "limited open forum," defined by the Act to exist whenever a public secondary school "grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C.A. § 4071(b). A school may establish a "limited public forum" for First Amendment purposes without at the same time creating a "limited open forum" under the Equal Access Act. However, it may do so only if the permissible and limited subject matter of the limited public forum does not go beyond "curriculum related student groups."

Here, the defendants insist that they have not opened the forum at East or West High Schools to include "one or more noncurriculum related student groups," and that to the contrary, such groups have consistently been denied access to the limited forum pursuant to the February 20, 1996 Policy.

Plaintiffs respond that in actual practice, the permissible subject matter of the Board's limited forum embraces non-curricular as well as curricular subjects. Thus, plaintiffs assert, the Board has improperly excluded the plaintiffs' viewpoint from a forum in which other viewpoints of a non-curricular nature are allowed. This, plaintiffs argue, denies them the access to school facilities guaranteed by the congres-

sionally enacted Equal Access Act and in addition is viewpoint discrimination in violation of the First Amendment.

At the heart of this case we find this question: *What is the permissible subject matter of the school district's forum for student groups at East and West High Schools?*

If, as defendants assert, the permissible subject matter is confined solely to "curriculum-related" subjects within the meaning of the Equal Access Act, then they may exclude plaintiffs' explicitly non-curricular group from the limited forum under both the Act and the First Amendment. If, as plaintiffs insist, the permissible subject matter embraces non-curricular subjects, and non-curricular student groups have been allowed access to the forum, then the exclusion of plaintiffs' non-curricular group from the forum may run afoul of both the Equal Access Act and the First Amendment.

### III

#### A. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for partial summary judgment on their First Claim for Relief (Equal Access Act, 20 U.S.C.A. § 4071), asserting that defendants have created a "limited open forum" within the meaning of the Equal Access Act, but have unlawfully denied plaintiffs access to that forum. Plaintiffs seek declaratory and injunctive relief as well as nominal damages. (Plaintiffs' Motion for Partial Summary Judgment, filed March 4, 1999 (dkt. no. 110), at 1.)

Plaintiffs assert that notwithstanding the defendants' February 20, 1996 Policy, the following groups are "non-curricular student groups" for Equal Access Act purposes:

| | |
|---|---|
| Improvement Council of East (East H.S.) ['97–'98] | ICE |
| Future Homemakers of America (East H.S.) | FHA |
| Future Business Leaders of America (East H.S.) | FBLA |
| National Honor Society (West H.S.) | NHS |
| Odyssey of the Mind (West H.S.) | OM |

Plaintiffs submit that whether the five groups in question are "non-curricular" presents a legal question to be decided upon undisputed material facts by applying the standards articulated in *Board of Education of Westside Comm. Schools v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), and later cases following *Mergens.* (Memorandum in Support of Plaintiffs' Motion for Summary Judgment, filed March 4, 1999 (dkt. no. 111) ("Pltfs' Mem."), at 26–27.)

Plaintiffs characterize the "primary focus" of each challenged group as follows:

ICE "creating a caring and positive school environment" [8]

FHA "helping the community, specifically the isolated, vulnerable and needy" [9]

FBLA "business students gathering "to socialize and explore careers" [10]

NHS "a community service organization" seeking "to help people in need" [11]

OM "creative thinking and problem solving" [12]

Plaintiffs assert that each group's primary focus, thus characterized, renders each "non-curricular" under *Mergens,* resulting in the creation of an Equal Access Act "limited open forum" at both East and West High Schools.

Defendants dispute plaintiffs' characterization of the primary focus or purpose of the five groups, arguing that each group clearly satisfies the *Mergens* criteria:

ICE ICE "meaningfully relates to the body of courses as a whole in the same way as the *Mergens* Court found that student government relates ..." Recently incorporated into East High's student government, ICE and its activities "are essential to the administration of student body activities and programs" [13]

FHA FHA promotes "personal growth and leadership development in the family and consumer sciences curriculum" by providing "opportunities for students to practice and apply the curriculum" taught in the courses [14]

FBLA FBLA provides "learning experiences and career-related activities to assist students in reaching their professional goals in business" as a state-sanctioned "applied technology education leadership organization" (ATELO) funded by federal, state and local school district money. [15]

NHS NHS does not "meet during non-instructional time," but nevertheless relates to "the body of courses as a whole" by "rewarding academic achievement" and "promoting academic excellence" [16]

OM OM involves "an organized system challenging problem-solving skills in club competition and in class" and the instructor uses the "OM approach" to learning for both in-class assignments and club exercises [17]

In each instance, defendants submit, the facts "demonstrate[ ] that these five (5) student groups are curriculum related" under *Mergens* and that the Salt Lake City School District "has maintained a closed forum policy" for Equal Access Act purposes "since the 1996–97 academic year." (Defs' Opp. Mem. at 2.) [18]

In reply, plaintiffs first clarify that they "do not assert that ICE is currently a non-curricular group, rather that it was a non-curricular group at the time this action was filed." (Memorandum in Reply to Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed April

8. (Pltfs' Mem. at 28.)

9. (*Id.* at 29.)

10. (*Id.* at 33.)

11. (*Id.* at 37.)

12. (*Id.* at 42.)

13. (Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed April 6, 1999 (dkt. no. 120) ("Defs' Opp. Mem."), at 16, 17.)

14. (*Id.* at 10, 11.)

15. (*Id.* at 7.)

16. (*Id.* at 18, 19.)

17. (*Id.* at 20.)

18. Defendants also argue that plaintiffs are not entitled to nominal damages or attorney's fees, regardless of the merits of their claim; Equal Access Act does not provide for damages and attorney's fees should not be awarded under § 1988 absent "a material alteration in the legal relationship between the parties."

15, 1999 (dkt. no. 125) ("Pltfs' Reply"), at I.) Concerning FHA, they argue that defendants did not "identify significant topics of a course that match up to the primary focus of helping the needy and vulnerable in the community." (*Id.* at 6.) As to FBLA, plaintiffs assert that "The complete set of activities for FBLA establishes a primary focus that was the same for the 97–98 and 98–99 school years: students interested in business getting together to socialize and explore careers." (*Id.* at 8.) They also argue that "*all* of NHS's activities other than its general meetings take place during non-instructional time, including community service projects, officers' meeting at lunch, and the induction ceremony," and that defendants have admitted "that NHS is a community service organization that spends most of its time working on community service projects." (*Id.* at 9 (emphasis in original).) As to OM, plaintiffs reply that the group's faculty adviser "uses *his own version* of creative thinking and problem solving" and that the problem-solving exercises that group members choose to work on do not originate in the district's own curriculum. (*Id.* at 10.)[19]

## B. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the grounds that (1) the district has "adopted, implemented and maintained a closed forum policy in compliance with the Equal Access Act," allowing "only curricular related student groups" to meet "on school premises during non-instructional time;" and (2) that this policy "on it face and as applied" does not constitute unlawful "viewpoint discrimination" under the First and Fourteenth Amendments. (Defendants' Motion for Summary Judgment, filed March 4, 1999 (dkt. no. 108), at 1.) Defendants assert that the February 20, 1996 Policy created a "nonpublic" fo-

rum for First Amendment purposes and that the "curriculum related" limitation is "viewpoint neutral." To the extent that the Policy prefers a "curriculum related" viewpoint or subject over a "non-curricular" viewpoint or subject, defendants argue this is permissible "given the public schools' legitimate educational mission," which often requires the schools to select particular viewpoints or activities that will be encouraged. Of necessity, the school's curriculum itself represents a selection of subjects and viewpoints.

Plaintiffs respond that the February 20, 1996 Policy has had the effect of preventing the expression of "gay-positive views," even on otherwise permissible "curriculum-related" topics within the existing student groups. As additional support, plaintiffs point to a recent application for approval of a "Rainbow Club," which plaintiffs allege has been denied, even though the Rainbow Club proposes to be a "curriculum related" group. (Memorandum in Support of Plaintiffs' Cross Motion for Partial Summary Judgment on Their First Amendment Claims and in Opposition to Defendants' Motion for Summary Judgment, filed April 6, 1999 (dkt. no. 117) ("Pltfs' Cross–Motion/Opp. Mem."), at 16–17.)

Defendants initially replied that the Rainbow Club's application remains pending and that any issues concerning the Rainbow Club fall outside the Second Amended Complaint and are not part of this lawsuit.[20] (Reply Memorandum in Support of Defendants' Motion for Summary Judgment, filed April 15, 1999 (dkt. no. 123), at 3–6.) Subsequently, however, it appears that Assistant Superintendent Seidel denied the Rainbow Club's application on the ground that the group's proposed subject matter is "sexual orientation," a topic "that is not a curricular subject taught at East High School." (De-

---

**19.** Plaintiffs repeatedly note that OM group problem-solving exercises—much like an unnamed brand of salsa in a TV commercial—come from *New Jersey.* (*Id.*)

**20.** If plaintiffs were permitted to raise the issue of the proposed Rainbow Club, defendants asked for an opportunity to conduct additional discovery.

fendants' Response to Supplemental Memorandum in Support of Plaintiffs' Motions for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment, filed June 11, 1999 (dkt. no. 133) ("Defs' Resp. to Supp. Mem."), at 2.)

### C. Plaintiffs' "Cross–Motion" for Partial Summary Judgment

As part of their response to defendants' motion, plaintiffs filed an additional "cross-motion" for partial summary judgment on their Second Claim for Relief under the First and Fourteenth Amendments, seeking a determination that (1) the adoption of the February 20, 1996 Policy was pretextual and was substantially motivated by an intent to silence "gay-positive views;" (2) the exclusion of the expression of "gay-positive views" from the existing limited public forum constitutes viewpoint discrimination in violation of the First Amendment; and (3) the exclusion of the proposed Rainbow Club from the designated limited public forum for "curriculum related" student groups amounts to impermissible viewpoint discrimination and violates the First Amendment.

Defendants initially responded that the "cross-motion" is untimely and prejudicial; that the Rainbow Club's application remains pending; and that any issues concerning the Rainbow Club fall outside the Second Amended Complaint and are not part of this lawsuit. (Reply Memorandum in Support of Defendants' Motion for Summary Judgment, filed April 15, 1999 (dkt. no. 123) ("Defs' Reply Mem."), at 3–6.) Following the Assistant Superintendent's denial of the Rainbow Club's application, the defendants reiterated their position that plaintiffs' motion was untimely and that the Rainbow Club's application falls outside the scope of this case. (Defs' Resp. to Supp. Mem. at 1–2.)

The Second Amended Complaint makes no explicit reference to the proposed Rainbow Club, or to any effort by plaintiffs to gain District approval for a "curriculum related" group under any name.[21] The East High Gay/Straight Alliance finds consistent treatment in plaintiffs' pleadings and moving papers as an unabashedly "non-curricular" organization. Beyond that, the Second Amended Complaint refers by name only to the Young Democrats at West High School.

However, the cross-motion for summary judgment does point to language in Paragraph 56 the Second Amended Complaint addressing plaintiffs' First Amendment claims:

56. Defendants have violated and are continuing to violate Plaintiffs' freedoms of expression and association under the First and Fourteenth Amendments to the United States Constitution and Plaintiffs' rights to due process of law and equal protection of the laws under the Fourteenth Amendment to the United States Constitution in several ways: by prohibiting the Alliance from meeting at the limited public forum created and maintained by Defendants at the public secondary schools within the District; by providing an opportunity for one or more noncurriculum related student groups to meet during noninstructional time on the premises of public secondary schools in the District, while denying equal access to and discriminating against students who wish to conduct other meetings, including plaintiffs, on the basis of the content of the speech of, and viewpoints expressed by, those other groups and their members; by impermissibly discriminating on the basis of content and viewpoint, even within the activities of approved "curriculum-related" clubs; by adopting policies and rules that dictate that no student group activity can include a gay-positive viewpoint; by failing to establish and apply clear and consistent, content- and viewpoint-

---

21. Paragraph 24 of the Second Amended Complaint alleges that "Plaintiffs Ivy Fox and Keysha Barnes wish to express their gay-sup-

portive viewpoints not only within the alliance, but also in other clubs, including existing and future 'curriculum-related' clubs."

neutral criteria for determining which student groups will be allowed to use the limited public forum Defendants have created; and by affording themselves unlimited discretion, applying vague standards, and acting arbitrarily and in a biased manner in deciding which students will be allowed to use the limited public forum Defendants have created.

(Second Amended Complaint at ¶ 56.) In addition, Paragraph 14 of the Second Amended Complaint avers that

because the Board and members of the public disfavored the content of the speech and viewpoints of that group and opposed allowing any group of students interested in discussing gay, lesbian, and bisexual issues to meet on school premises, the Board voted on February 20, 1996 to prohibit *all* student groups or organizations "not directly related to the curriculum" to "organize and meet on school property" at any public secondary school in the District.

(*Id.* at ¶ 14 (emphasis in original).)

Apart from their assertions concerning the proposed Rainbow Club, plaintiffs' cross-motion appears to address their existing First Amendment claims, at least as the same are outlined in very general terms in the Second Amended Complaint. It responds directly to defendants' motion for summary judgment, which seeks a ruling favorable to the defendants on these same claims, and as a response, it does not appear to be untimely. Plaintiffs are thus entitled to consideration of the substance of their cross-motion insofar as it speaks to those First Amendment claims pleaded in the Second Amended Complaint and challenged by defendants' motion for summary judgment.

## IV

### "Curriculum–Related" vs. "Non–Curricular" Student Groups

According to *Board of Education of Westside Comm. Schools v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), a group is deemed "curricular" if it "directly relates" to a school's curriculum, and

a student group directly relates to a school's curriculum if *the subject matter of the group is actually taught or will soon be taught, in a regularly offered course;* if *the subject matter of the group concerns the body of courses as a whole;* if *participation in the group is required for a particular course;* or if *participation in the group results in academic credit.*

*Id.* at 239–40, 110 S.Ct. 2356 (emphasis added). Plaintiffs urge the correctness of this court's prior observation that "the required analysis under *Mergens* appears to be qualitative rather than quantitative: if at least part of a club's activities enhance, extend, or reinforce the specific subject matter of a class *in some meaningful way,* then the relationship between club and class is more than tangential or attenuated, and the club may be 'directly related' to the class in terms of its subject matter." *East High Gay/Straight Alliance v. Board of Education of Salt Lake City School District,* 30 F.Supp.2d 1356, 1360 (D.Utah 1998) (emphasis added & footnote omitted). Plaintiffs also "fully embrace" the Third Circuit's "refinement in the statutory interpretation" in *Pope:*

the curriculum-relatedness of a student activity must be determined by reference to the *primary* focus of the activity measured against the *significant* topics taught in the course that assertedly relates to the group.

*Pope v. East Brunswick Board of Education,* 12 F.3d 1244, 1253 (3d Cir.1993) (emphasis supplied by plaintiffs)—an articulation that plaintiffs find neither "rigid" nor "overly elastic." (Pltfs' Mem. at 19–22.)

Plaintiffs' method of analysis first attempts "[t]o identify the primary focus of a student group" by reviewing "the record as a whole for the activities of that particular group." (*Id.* at 22.) The group's activ-

ities are then "assayed" to determine "what is substantial activity or what is 'isolated' activity," and "the various activities [are] assigned their proper weight." (*Id.* at 23.) [22] Borrowing a phrase from *Pope*, plaintiffs assert that "the primary focus of a student group cannot turn on what is only a 'part' of its activities," meaning that "a 'part' of a student group's activities cannot be the basis for providing a direct connection to the curriculum." (*Id.* at 24.) [23]

The weight assigned to various activities, plaintiffs explain, does not turn on "the mere numbers of any type of activity .... Instead, one must balance the substantiality of that category of activity with other activities on the record as a whole for a group. The balance determines the relative weight for each category of activity." (*Id.* at 25.) A group's "relatively substantial activities," plaintiffs conclude, "constitute the primary focus" of the group. (*Id.*)

Plaintiffs propose a similar assay process for determining the "significant topics" actually taught in classes to which a group purportedly relates: "the determination of significant topics in a course turns on the relative weight of topics on the record as a whole for the course." (*Id.* at 26.)

. Plaintiffs' "assay" method, aptly named, operates on the fundamental premise that various kinds of student group activities— social, fundraising, community service— are mutually exclusive of each other when it comes to determining the subject matter or "primary focus" of the club. For instance, plaintiffs appear to proceed upon the assumption that "community service" cannot "enhance, extend, or reinforce the specific subject matter of a class in some meaningful way," and that where a student group engages in significant community service activities "the relationship between club and class" must have "meaningfully diverged."

Defendants urge that community service activities may well be "directly related" to a class in terms of its subject matter and not at all repugnant to the designation of a student group as "curriculum-related."

Likewise, classifying a group's activities under the general headings "fund-raising" or "social" may not accurately describe the relationship between the substance of the activities and the substance of the course to which they relate. A high school literature or drama class may spend some time reading the works of Shakespeare. A Literature Club or a Drama Club may devote considerable time and energy to "fund-raising" activities—all in an effort to pay for a field trip to attend a Shakespeare festival some distance away. May it fairly be said that club and class have "meaningfully diverged," and the club may be "non-curricular" under § 4071(b), because its "primary focus" appears to be "fundraising?" Or in a high school with a swimming class and a Swimmers' Club, does a group-sponsored beach party diminish or attenuate the club's relationship to the class because the event may be characterized as "social?"

In each instance, probably not.

In probing for relationships between facts, characterizations and classifications may not tell the whole story. Indeed,

---

**22.** Plaintiffs concede that "[a]t the threshold, the inquiry is in some measure quantitative ...." (*Id.* at 23–24.)

**23.** Here plaintiffs appear to be disputing this court's earlier expression of the standard for measuring curriculum-relatedness following *Mergens*:

> [I]f at least *part* of a club's activities enhance, extend, or reinforce the specific subject matter of a class in some meaningful

way, then the relationship between club and class is more than tangential or attenuated, and the club may be "directly related" to the class in terms of its subject matter. Where that is not the case, club and class have "meaningfully diverged," and the club may be "non-curricular" under § 4071(b). *East High Gay/Straight Alliance,* 30 F.Supp.2d at 1360 (emphasis added & footnotes omitted).

using the assay approach, how one defines and labels the *categories* has as much or more to do with determining the outcome of the analysis than the nature of the *activities* themselves. Classification takes the place of description and the real relationships among the actual facts may be lost or ignored.

Here, plaintiffs' classifications focus on the immediate *purpose* of a group activity—community service, social, fund-raising—to the exclusion of almost everything else. In weighing and balancing, plaintiffs assign each activity to one category of purpose, *e.g.*, a "fund-raiser." The group's subject matter or "primary focus" is then defined in terms of which category predominates. In this way, the significance of activities in any one category is automatically diminished by the number of activities assigned to other categories.

Nothing in *Mergens'* reading of the Equal Access Act explicitly endorses plaintiffs' assumptions or classifications, or even suggests that district courts should engage in the kind of subtractive reasoning that plaintiffs' weighing-and-balancing assay method represents. As this court has noted before, even as to groups challenged in that case, *Mergens* did not assay each and every student activity for its substantive course content.

■ It follows that curriculum-related student groups, like non-curricular student groups, need not serve merely as an extension of the classroom experience in order to avoid triggering the Act's protections. Members of a curriculum-related group may socialize, raise funds, and even assist others as part of their group activities without altering the group's status under the Act.

In earlier observing that "the required analysis under *Mergens* appears to be qualitative rather than quantitative," *East High Gay/Straight Alliance*, 30 F.Supp.2d

at 1360, this court was suggesting in part that the required relationship between club and class is more logical than it is statistical in nature. To say that a particular group had "ten significant community service projects," four socials, three fund-raisers, and that the "service projects were far greater in both absolute numbers and in substantiality, when compared to the socials," (Pltfs' Mem. at 30, 31) says essentially nothing about whether the activities draw upon skills taught in the classroom or provide valuable "hands-on" experience extending the learning process beyond what one reads in a textbook or hears in a class lecture. To say that the statistical category "community service projects" adequately characterizes a group's subject matter, and that as thus characterized "the group's subject matter is not actually taught in a course," takes the facts entirely out of the equation, leaving only empty abstractions.[24]

The soundness of this kind of reasoning seems doubtful at best. Indeed, this approach may permit a plaintiff to invoke the Act simply "by strategically describing existing student groups," exalting semantics over substance in essentially the same fashion as was condemned by the Court in *Mergens*, 496 U.S. at 244, 110 S.Ct. 2356.

For their part, defendants suggest a "more pragmatic" approach to evaluating the relationship between group subject matter and course content: "This Court should focus its inquiry upon the applications of the currently approved student groups challenged by plaintiffs, not the activities of student groups in previous school years." (Defs' Opp. Mem. at 6.) Defendants argue that "[t]his approach is more fair to current student groups and to the district because the Assistant Superintendent must likewise 'approve' or 'deny' a student group's application based upon information presented with the application at the beginning of the year." (*Id.*)

---

**24.** In this way, plaintiffs are able to assert that a "community service project" involving 266 hours of caramel-making has no direct relationship to high school courses teaching food preparation skills. (*See* Pltfs' Mem. at 30, 32.)

Plaintiffs object that this approach would "focus the inquiry only on evidence that is generated by Defendants' employees, which may be inconsistent with the students' wishes and their actual activities." (Pltfs' Reply Mem. at 3.) The written applications "could always carry the day, regardless of the facts in practice." (*Id.*)

 Recognizing that *Mergens'* definition of "noncurriculum related student activities" expressly "looks to a school's actual practice rather than its stated policy," 496 U.S. at 246, 110 S.Ct. 2356, defendants' suggested method treads too close to "permit[ting] schools to evade the Act by strategically describing existing student groups"—an approach soundly rejected by *Mergens.* The court must examine the record of the student groups' actual activities as well as their stated purposes in order to make a qualitative determination as to curriculum-relatedness.

### ICE

As it functioned during the 1997–98 school year, the Improvement Council at East (ICE) sought to create a "caring, positive school environment at East." (Pltfs' Mem. at 4 ¶ 12.) [25] It met on school premises during non-instructional time and engaged in activities consistent with that purpose. During the 1997–98 year, ICE was not yet integrated into student government and academic credit was not given to students participating in ICE activities; nor was participation in ICE required by any existing school course.

The defendants respond that "[t]he activities of ICE are varied and numerous, although all activities involve the improvement of the physical and emotional environment of the school." (Defs' Opp. Mem. at 14.) ICE's activities "were always directly related to faculty committee and student government subject matters. Accordingly," defendants argue, "the fact

that ICE was permitted to meet on school premises during noninstructional time during [the] 1997–98 school year did not violate the district's closed forum policy or the Equal Access Act." (*Id.* at 18.)

In reply, plaintiffs point out that following the commencement of this lawsuit, the defendants denied ICE's application for approval as a curriculum-related group for the following year, at least until the group became formally integrated into student government at East High School through a December 1998 amendment to the East High Constitution. (Pltfs' Reply Mem. at 1 ¶¶ 12, 18; *id.* at 5 & n. 7.) ICE's 1997–98 activities cannot be tied to subject matter actually taught in a course; nor do they relate to the body of courses as a whole in a way that would satisfy *Mergens.* (*Id.*) Plaintiffs analogize ICE to the Peer Advocates, a service group that the Court in *Mergens* found to be non-curricular. (Pltfs' Mem. at 28 (citing *Mergens,* 496 U.S. at 246, 110 S.Ct. 2356).) Defendants would not allow ICE to meet during the 1998–99 school year until after the integration into student government had been accomplished—a telling admission, plaintiffs suggest, of the non-curricular nature of the group. (*Id.* at 29 ("The denial confirms the conclusion that ICE's subject matter did not directly relate to the curriculum.").)

Having reviewed the factual materials submitted by the parties, this court concludes that to the extent that it met on school premises during non-instructional time during the 1997–98 school year, the Improvement Council at East was a noncurricular student group within the meaning of the Equal Access Act. During that time frame, then, the defendants had created a "limited open forum" at East High School that triggered the Act's guarantees of access by non-curricular student

---

**25.** It appears that ICE (originally the Student Advocacy Board) met at East High from its creation in 1993 until "four of five weeks into" the 1998–99 school year. (Defs' Opp. Mem. at 14; Deposition of Phyllis Shores, dated January 7, 1999, at 50:24–51:7.)

groups.[26]

### FHA

Concerning the Future Homemakers of America (FHA), plaintiffs contend that "helping the community, specifically the vulnerable and needy," does not directly relate to the curriculum. (Pltfs' Mem. at 29.) Using their "weighing and balancing" assay approach, plaintiffs argue that when collated into plaintiffs' statistical categories, FHA's activities clearly preponderate as "community service" rather than curriculum-related in nature: FHA's "important service to the needy is the strongest thread that pulls them together, their primary focus, and thus their subject matter." However, as thus defined, "the group's subject matter is not actually taught in a course," and FHA does not have other *Mergens* factors tying its activities to the East High curriculum. (*Id.* at 32.)

Defendants respond that FHA's stated purpose "is to promote personal growth and leadership development in the family and consumer sciences curriculum," and that FHA activities "provide opportunities for students to practice and apply the curriculum that is taught in ... Family and Consumer Sciences courses." (Defs' Opp. Mem. at 10, 11.) They assert that the "community service projects" highlighted by plaintiffs "directly relate to skills taught in the three major subjects in the Family and Consumer Science curriculum[:] food, sewing and child development.... [T]he common thread among these FHA/HERO community service projects is that the students utilize the skills learned in the classroom to provide food, clothing and child care to those in need." (*Id.* at 12–13.) Indeed, "The unique character of vocational education is that students acquire the skills necessary to provide products and services that are valuable in the workplace and in the community. It is not surprising that a vocational student group such as FHA performs community service projects utilizing their vocational skills." (*Id.* at 13.)

Plaintiffs reply that the defendants do not "identify significant topics of a course that match up to the primary focus of helping the needy and vulnerable in the community," in essence reiterating their initial argument that "community service" is not taught in East High classrooms. (Pltfs' Reply Mem. at 6.) Relying upon FHA's application for District approval, plaintiffs attempt to minimize the relationship between FHA's activities involving children and East High's child development classes, arguing that "helping children ... is only a small *part* of their primary focus, which is insufficient for a direct curricular connection ... [and] does not match up to the significant topics of the Child Development course ...." (*Id.* (emphasis in original).)

If in fact "[t]he burden of showing that a group is directly related to the curriculum rests on the school district," *Pope,* 12 F.3d at 1252, then this court concludes that defendants have met their burden as to FHA and that FHA is a curriculum-related group. FHA's activities, community service-oriented though they may be, nevertheless serve to enhance, extend, or reinforce the specific subject matter of one or more Applied Technology Education classes in a meaningful way, generally by affording students an opportunity to apply the skills that they have learned in the classroom. (*See* Defs' Opp. Mem. at x-xii ¶¶ 18–30.)

Put another way, plaintiffs have failed to show their entitlement to judgment as a matter of law under Rule 56 that FHA at East High School is a non-curricular student group whose meeting at East High during non-instructional time triggers the Equal Access Act's guarantees.

26. Plaintiffs do not now contend, and this Court need not now decide, that ICE as currently integrated into the East High student government constitutes a non-curricular student group.

### FBLA

As was the case on their earlier motion for preliminary relief, plaintiffs challenge the curriculum-relatedness of the Future Business Leaders of America (FBLA) at East High, renewing their assertion that FBLA's primary focus involves students "getting together to socialize and explore careers." (Pltfs' Mem. at 33.) Plaintiffs' categorical assay of FBLA's activities identifies "two substantial categories: socials and career exploration." (*Id.*) Plaintiffs acknowledge that FBLA's "career activities are also an integral part of its primary focus," but argue that the "subject matter of business students socializing and exploring careers is not 'actually taught,' because it does not match significant topics in a course." (*Id.* at 35, 36.) Yet defendants' statement that "[t]he course goals for 'Business Management' include *exploring 'career opportunities,'*" (Defs' Opp. Mem. at ix ¶ 13 (emphasis added)), stands uncontroverted by plaintiffs and appears substantially to match the dual "primary focus" identified for FBLA by plaintiffs— "to socialize and *explore careers.*" (Pltfs' Reply Mem. at 8 (emphasis added).)

This court has again reviewed the activities of FBLA as set forth in the parties' respective statements of fact (*see* Pltfs' Mem. at 9–12 ¶¶ 39–55; Defs' Opp. Mem. at vi-x ¶¶ 4–17), and remains satisfied that FBLA maintains the direct relationship to East High's Applied Technology Education curriculum that is required for FBLA to be deemed "curriculum-related" under *Mergens. See also East High Gay/ Straight Alliance,* 30 F.Supp.2d at 1360–62.

That FBLA also holds "social" events does not negate this direct relationship. A "social" event may well be held to "get to know one another, and to have some fun" as plaintiffs suggest, (Pltfs' Mem. at 10 ¶ 45), but the event may also serve to build interest in and enthusiasm for the group and its more substantive business- and career-oriented activities. The two certainly are not mutually exclusive, and this court does not read the Equal Access Act to require the defendants to take the "fun" out of FBLA in order to preserve its direct relationship to the curriculum. Plaintiffs' assertions to the contrary merely serve to illustrate the subtractive nature of their "assay" approach to the group's activities.

### NHS

Like the FHA at East High, plaintiffs contend that the National Honor Society (NHS) at West High School has "community service to the needy" as its primary focus and subject matter, and that "the promotion of academic excellence does not capture the subject matter of West High NHS." (Pltfs' Mem. at 37, 38.) Plaintiffs point once more to *Garnett v. Renton School District,* 772 F.Supp. 531 (W.D.Wash.1991), *rev'd on other grounds,* 987 F.2d 641 (9th Cir.1993), and its determination that a student group which combined general academic achievement with community service was non-curricular. (*Id.* at 40–41.)

Defendants attempt to sidestep plaintiffs' assertions by pointing out that NHS "does not meet during non-instructional time," (Defs' Opp. Mem. at 18), and therefore does not trigger the Equal Access Act's protections regardless of how its subject matter may be characterized. Plaintiffs reply that "*all* of NHS's activities other than its general meetings take place during non-instructional time, including the community service projects, officers' meetings at lunch, and the induction ceremony," held in the evening in the school cafeteria. (Pltfs' Reply Mem. at 9 (emphasis in original). *See* Pltfs' Mem. at 12 ¶¶ 56–61; *id.* at 41 & n17; Defs' Opp. Mem. at v.)

The Act defines non-instructional time to mean "time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends." 20 U.S.C.A. § 4072(4). In *Ceniceros v. Board of Trustees of the San Diego Unified School District,* 106 F.3d 878, 880 (9th Cir.1997), the Ninth Circuit held that

"[t]he plain meaning of 'noninstructional time,' as defined in § 4072(4), includes the lunch period" at a district high school. In his dissenting opinion, Judge Lay carefully reviewed the legislative history of the Act, concluding that Congress intended "noninstructional" time to embrace only those times immediately before and after the normal school day. *Id.* at 885–89. It appears that the Tenth Circuit has yet to address the question.

In either event, it seems doubtful that NHS's annual induction ceremony, held in the evening hours, falls within the scope of "noninstructional time" under § 4072(4); nor do general meetings held during *instructional* time at West. (*See* Defs. Opp. Mem. at xvi ¶ 57 ("Meetings of members of NHS are held in the faculty advisor's classroom during third period." (citation omitted)).) Likewise, community service projects that take students away from the West High campus at times other than the hours immediately before or after school (*e.g.*, Saturdays spent assisting Habitat for Humanity) cannot fairly be considered in determining whether defendants have created a limited open forum at West High School.

Assuming that at least some NHS activities or meetings are held on school premises during non-instructional time, does the NHS's community service orientation negate the honor society's direct relationship to the curriculum as a whole? This court concludes that it does not.

As this court earlier observed:

Activities promoting academic excellence have a far more direct relationship to the school's "body of courses as a whole" than does a student government group that in some undefined way "addresses concerns, solicits opinions, and formulates proposals" pertaining to the curriculum. Academic excellence has no meaning apart from the courses of study

offered by a school and cannot be achieved outside of the school's curriculum. By definition, then, academic achievement can have no "noncurriculum related" subject matter.

*East High Gay/Straight Alliance,* 30 F.Supp.2d at 1363. Remembering that "[a]ny sensible interpretation of 'noncurriculum related student group' must ... be anchored in the notion that such student groups are *those that are not related to the body of courses offered by the school,*" *Mergens,* 496 U.S. at 237, 110 S.Ct. 2356 (emphasis added), to find that NHS at West High School is a "noncurriculum related student group" requires the court to conclude that NHS "does not relate *directly* to the body of courses offered by the school." *Id.* at 239, 110 S.Ct. 2356 (emphasis in original). Such a conclusion in this instance defies logic and requires the court to ignore pertinent facts. So long as NHS relates directly to the body of courses as a whole by honoring, recognizing and encouraging academic achievement in the specific context of West High School's curriculum—and this court concludes that it does—participation by NHS members in community service projects does not negate that relationship or render non-curricular that which is otherwise undeniably curriculum-related.[27]

## OM

Plaintiffs assert that the subject matter of the West High Odyssey of the Mind (OM) group is "O.M. creative thinking and problem solving." (Pltfs' Mem. at 42.) The group's faculty advisor incorporates creative thinking and problem solving into the content of the courses he teaches. (*Id.*) Curiously, however, plaintiffs characterize this subject matter as a "teaching technique" rather than as a set of learned intellectual skills and argue that "[a] student group cannot directly relate to the

---

**27.** To the extent that *Garnett v. Renton School District,* 772 F.Supp. 531 (W.D.Wash.1991), *rev'd on other grounds,* 987 F.2d 641 (9th Cir.1993), may suggest a different result herein based upon that court's treatment of the "SKY Club" in that case, *id.* at 533, this court declines to follow that suggestion.

curriculum through a teaching technique." (*Id.* at 42, 43.) They then try to analogize OM's subject matter to *Mergens'* treatment of a high school chess club, which was said to " 'supplement math and science courses because it enhances students' ability to engage in critical thought processes.' " 496 U.S. at 244, 110 S.Ct. 2356. Noting that "chess is not taught in any regularly offered course at the school," *Mergens* held the chess club to be noncurricular. *Id.* at 245, 110 S.Ct. 2356.

Here, however, the substantive content of the OM group, *viz.*, sophisticated "creative thinking and problem solving" skills, finds direct reflection in the "creative thinking and problem solving" skills actually taught by the group's advisor in his regular classes. By analogy, it is as though chess playing is actually taught as part of the content of a course, enhancing the same "critical thought processes" (mostly mathematical vector analysis), as are cultivated by the "primary focus" of a chess club—playing chess.

Creative thinking and problem solving are mental processes. A process may be learned. The intellectual skills needed to carry on a process in an effective way are learnable as well.[28]

By analogy, legal reasoning is a process that requires skills that many believe they learn in law school.[29] Legal reasoning, of course, has substance distinct from the teaching technique (often the "Socratic method") used to impart it.[30] To borrow plaintiffs' terms, legal reasoning is the content; the Socratic method is the form.

If as plaintiffs suggest, "the *Mergens* Court focused on content and not form," (Pltfs' Mem. at 43), then we should focus on OM's substantive creative thinking and problem solving skills as the content—

content that is actually taught both as a significant part of the faculty advisor's classes and OM's group activities.

The court concludes that the subject matter of Odyssey of the Mind at West High School bears a significant direct relationship to the substance actually taught in courses at West High School and that OM is a "curriculum-related" student group for purposes of the Equal Access Act. Allowing OM members to meet together to hone the creative thinking and problem solving skills they may have learned in class does not convert West High School into a limited open forum under the Act.

The court thus concludes that with the exception of the Improvement Council at East during the 1997–98 school year, the subject matter of the five student groups addressed by plaintiffs' summary judgment motion bears a direct relationship to the curriculum at either East High School or West High School and are not "noncurriculum related student groups" within the meaning of 20 U.S.C.A. § 4071(b) (1990). The presence of ICE at East High School during the 1997–98 school year operated to create a "limited open forum" under the Equal Access Act during the time period that ICE was allowed to meet on school premises. To the extent that plaintiffs were denied the opportunity to meet during that same time period, plaintiffs' rights under the Equal Access Act were violated. However, the East High limited open forum was terminated after the end of the 1997–98 school year, and at that point the violation of plaintiffs' rights under the Act ceased.

Therefore, plaintiffs' Motion for Partial Summary Judgment should be granted in part (concerning ICE during the 1997–98 school year at East High) and denied in all other respects. To the extent that defen-

---

**28.** *See generally, e.g.,* Roger von Oech, *A Whack on the Side of the Head: How You Can Be More Creative* (rev. ed.1990).

**29.** *See generally* Ruggero J. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* (3d ed.1997); Steven J. Burton, *An Introduction*

*to Law and Legal Reasoning* (2d ed.1995); Edward H. Levi, *An Introduction to Legal Reasoning* (1949).

**30.** *See generally* Karl N. Llewellyn, *The Bramble Bush: On our Law and its Study* (1960).

dants' Motion for Summary Judgment seeks a determination that the Salt Lake City School District did not establish a "limited open forum" following the adoption of the February 20, 1996 Policy, that motion must be denied as to East High School for the 1997–98 school year and granted in part, at least to the extent that plaintiffs have contested the curriculum-related nature of particular student groups approved pursuant to that Policy.

## V

### The Equal Access Act and 42 U.S.C. § 1983

■ The court rejects defendants' view that plaintiffs' First Amendment claims pleaded under 42 U.S.C. § 1983 are pre-empted by the Equal Access Act, with its implied private cause of action. While defendants look to *Mergens* for the views of three Justices, (*see* Defs' Resp. to Supp. Mem. at 4), this court relies upon the majority opinion,[31] which rejected the view that Congress intended the Equal Access Act to wholly incorporate pre-enactment First Amendment protections, creating a substitute remedy:

> [T]he Act itself neither uses the phrase "limited public forum" nor so much as hints that the doctrine is somehow "incorporated" into the words of the statute. The operative language of the statute, 20 U.S.C. § 4071(a), of course, refers to a "limited open forum," a term that is specifically defined in the next subsection, § 4071(b). Congress was presumably aware that "limited public forum," as used by the Court, is a term of art, *see Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45–49, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), and had it intended to import that concept into the Act, one would suppose that it would have done so explicitly. Indeed, Congress' deliberate choice to

use a different term—and to define that *term—can only mean that it intended to establish a standard different from the one established by our free speech cases.*

*Mergens*, 496 U.S. at 242, 110 S.Ct. 2356 (emphasis added). Moreover, defendants do not explain how it can be said that "the remedial devices provided in [the Equal Access Act] are sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). The Equal Access Act has no express "remedial devices" or enforcement mechanism. Defendants themselves point out that the "remedial device" of a private lawsuit is *implied* rather than expressly provided by the Act. They point to nothing in the admittedly unreliable legislative history that suggests "a congressional intention to preclude reliance on section 1983 as a remedy." *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 723 (6th Cir.1996). In *Sea Clammers*, the Court noted that the two environmental statutes in question in that case "do provide quite comprehensive enforcement mechanisms. It is hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies, including two citizen-suit provisions." 453 U.S. at 20, 101 S.Ct. 2615 (citation & footnote omitted).

Indeed, the *Mergens* Court seemed untroubled by the fact that the plaintiffs in *Mergens* asserted claims under both the Equal Access Act and the First Amendment. The Court's ruling that the school district in that case had violated the Equal Access Act rendered unnecessary a determination of plaintiffs' constitutional claims. However, nothing in *Mergens* even hints that an implied remedy under the Act is a

---

**31.** Defendants' reference to the *Mergens* "plurality," (Defs' Resp. to Supp. Mem. At 4), remains mystifying. Part II–B of the lead opinion in *Mergens*, 496 U.S. at 237–243, 110 S.Ct. 2356, cited by defendants and quoted above by the court, appears to reflect the views of six out of nine justices—a majority of the Justices, the court believes.

substitute for a § 1983 suit to vindicate First Amendment rights of public school students.[32]

## VI

## Plaintiffs' First Amendment Claims

As outlined above, plaintiffs' cross-motion addresses three claims asserted under the First and Fourteenth Amendments: (1) that the adoption of the February 20, 1996 Policy by the defendant Board was pretextual and was substantially motivated by an intent to silence "gay-positive views;" (2) that the blanket exclusion of the expression of "gay-positive views" from the existing forum for curriculum-related student groups constitutes impermissible viewpoint discrimination in violation of the First Amendment; and (3) the exclusion of the proposed Rainbow Club from the designated limited public forum for "curriculum-related" student groups amounts to impermissible viewpoint discrimination and violates the First Amendment.

No one in this case asserts that East or West High School is a traditional or designated public forum, open to expression on topics as wide as the world and speakers as diverse as the general public. Plaintiffs assert instead that these schools have been designated as a limited public forum for student groups. Defendants argue that the Board has created a nonpublic forum with speakers and subject matter strictly delimited by the February 20, 1996 Policy to include only "curriculum-related" student groups. Nevertheless,

It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). Other principles follow from this precept. In the realm of private speech or expression, government regulation may not fa-

vor one speaker over another. *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984). Discrimination against speech because of its message is presumed to be unconstitutional. See *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641–643, 114 S.Ct. 2445, 2458–2460, 129 L.Ed.2d 497 (1994). These rules informed our determination that the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115, 112 S.Ct. 501, 507–508, 116 L.Ed.2d 476 (1991). When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. See *R.A.V. v. St. Paul,* 505 U.S. 377, 391, 112 S.Ct. 2538, 2547, 120 L.Ed.2d 305 (1992). Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. See *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

*Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 828–29, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). "These principles," the Court continues, "provide the framework forbidding the State from exercising viewpoint discrimination, even when the limited public forum is one of its own creation." *Id.* at 829, 115 S.Ct. 2510.

Moreover, where viewpoint discrimination has been alleged, it matters little whether the forum may be character-

---

**32.** Except for *Sea Clammers* and *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), also cited by defendants, "the Court has determined that the federal statutes under consideration did not foreclose a § 1983 lawsuit." Karen M. Blum & Kathryn R. Urbonya, *Section 1983 Litigation* 50 (1998) (footnote omitted).

ized as a limited public forum or as a nonpublic forum because even "nonpublic forum status 'does not mean that the government can restrict speech in whatever way it likes.'..." *Forbes,* 523 U.S. at 682, 118 S.Ct. 1633 (quoting *International Society for Krishna Consciousness v. Lee,* 505 U.S. at 687, 112 S.Ct. 2701 (O'Connor, J. concurring)) (citation omitted). "To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum *must not be based on the speaker's viewpoint* and must otherwise be reasonable in light of the purpose of the property." *Id.* (emphasis added) (citing *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439).

Plaintiffs' claims raise the question whether as a result of defendants' conduct, plaintiffs have been excluded from the forum for student groups at East and West High Schools because of their viewpoint, asking yet again the question raised earlier in this opinion: what is the permissible subject matter of the forum for student groups at East and West High Schools? To be actionable, the viewpoint allegedly excluded must itself be germane to the permissible subject matter of the forum:

> [I]n determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, *which is presumed impermissible when directed against speech otherwise within the forum's limitations.*

*Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510 (emphasis added) (citing *Perry Ed. Assn.,* 460 U.S. at 46, 103 S.Ct. 948).

Based upon its review of the record and the materials submitted by the parties on the present motions, the court concludes that the "permissible subject matter" of the existing forum for student groups encompasses the subject matter actually taught in courses offered at each high school and any additional matters which would be deemed "curriculum related" as the *Mergens* Court read that phrase in construing the Equal Access Act. It embraces as well the activities of bona fide "curriculum-related" student groups approved to meet within the forum. The permissible subject matter is *not,* as plaintiffs would urge, the "generally open," noncurricular subject matter of the kind attributed to the university at issue in *Widmar.*

In creating either a limited public forum or a nonpublic forum,[33] the Board may set restrictions on speaker identity and subject matter "if the distinctions drawn are reasonable in light of the purpose served by the forum." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439. If "the restriction is reasonable in light of the purpose served by the forum and is 'not an effort to suppress expression merely because [school] officials oppose the speaker's view,' it does not violate the First Amendment." *Hawkins v. City and County of Denver,* 170 F.3d at 1287 (quoting *Forbes,* 523 U.S. at 678, 118 S.Ct. 1633 (internal quotation marks omitted)).

In this case, the permissible subject matter of the existing forum for student groups at East or West High Schools as

**33.** Defendants insist that the District maintains a nonpublic forum for First Amendment purposes. (Defs' Mem. at 15–16 & n.5.) Remembering that we are dealing with "school-tolerated student speech," it does not appear that defendants have done "no more than reserve eligibility for access to the forum to a particular class of speakers"—presumably students who attend meetings of curriculum-related student groups—"whose members must then, *as individuals,* 'obtain permission,' ... to use it." *Forbes,* 523 U.S. at 679, 118 S.Ct. 1633 (emphasis added & citation omitted). From the record it appears that students participating in approved groups may generally speak their minds without first seeking permission "as individuals" to speak. While the groups or clubs must seek permission to meet, the clubs do not speak; the student members do.

defined above is reasonable in light of the purpose served by the forum, "focusing student group activities upon curricular subject matters," (Defs' Mem. at 7), and on its face at least, the February 20, 1996 Policy designating a forum for "curriculum-related" student groups does not violate the First Amendment. To that extent, defendants are entitled to summary judgment.

Plaintiffs' First Amendment claims persist, however, and ask whether within the context of the permissible subject matter as thus defined, the defendants have wrongfully excluded plaintiffs' viewpoint from the forum for student groups that the February 20, 1996 Policy creates.

## A. Adoption of the February 20, 1996 Policy

On its face, the February 20, 1996 Policy remains neutral on matters of viewpoint so long as the subject matter of a student group may be shown to be directly related to the curriculum—a permissible subject matter tailored to avoid the creation of a statutory "limited open forum" under the Equal Access Act, and a content-based restriction that is reasonable in light of the purpose served by the forum consistent with the First Amendment.

Earlier, this court declined to allow discovery inquiring into the individual motivations of Board members who participated in the adoption of that Policy. (*See* Memorandum Opinion and Order, dated January 8, 1999 (dkt. no. 93).) Policy-making by

the Board, this court said, was essentially a legislative function, and that "[i]nquiry into the personal motivations of individual legislators proves to be a 'hazardous matter,' problematic at best." (*Id.* at 7, 8.) This court declined to go behind the February 20, 1996 Policy and examine the motives of those who adopted it. (*Id.* at 9–10.)

Plaintiffs now allege that the February 20, 1996 Policy disguises a broader unwritten policy that seeks to exclude all "gay-positive views" from the forum at East High School, regardless of how that forum may be characterized. They seek to test whether the Board's justifications for the February 20, 1996 Policy "are not simply 'post hoc rationalizations' or a pretext for viewpoint discrimination." *Summum v. Callaghan,* 130 F.3d 906, 920 (10th Cir. 1997); *see Cornelius v. NAACP Legal Defense & Educational Fund,* 473 U.S. 788, 812, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (valid and reasonable justifications "cannot save an exclusion that is in fact based on the desire to suppress a particular point of view"). The allege that the *effect* of the February 20, 1996 Policy, taken together with the purported unwritten policy, is to exclude "gay-positive viewpoints" from the forum entirely, regardless of the subject matter.

However, plaintiffs have failed to carry their initial burden to demonstrate "that there is no genuine issue as to any material fact" concerning that question.[34] Fed. R.Civ.P. 56(c).

---

**34.** Plaintiffs' counsel seemed to acknowledge as much at the April 16th hearing:

> MR. DAVIDSON: * * * *
> And so what they have basically done is they have taken what appears to be a neutral policy ... which says curricular clubs only but it is really what we say the Supreme Court was talking about in Cornelius is a facade for discrimination because they got rid of the only opportunity to express gay positive viewpoints, did that intentionally and has had that effect and specifically has excluded students from talking about things from a gay positive viewpoint as a matter of policy, excluded them from talk-

> ing about that within any forum for student groups on campus.
> So *we say at a minimum there is a factual dispute about whether they have this prohibition or not.* There's enough in the record that *indicates it appears that is their policy.* Certainly the fact that the superintendent says I think that's the policy, I may be wrong, but I think that's the way the policy applies, and that one of the board members definitely thinks that's the way the policy applies is enough to create a factual dispute about whether or not there is a facial violation of the plaintiff's 1st Amendment [rights] going on.

However, this does not mean that defendants are entitled to summary judgment on this claim. Plaintiffs point to at least one sworn averment [35] supporting an inference of discriminatory intent based upon viewpoint, and raising a genuine issue of material fact as to whether the Board's justifications for adopting the February 20, 1996 Policy are pretextual, and whether there exists a broader unwritten school district policy excluding all "gay-positive views." (*See* Pltfs' Cross–Motion/Opp. Mem. at 34–43 (citing, *inter alia*, the Deposition of Darline P. Robles, dated January 29, 1999 at 13:24–14:8, 26:11–16, 36:16–37:20, 101:14–103:9).) The existence of a blanket unwritten viewpoint exclusion is a question that may be further addressed at a Pretrial Conference.

## B. Viewpoint Discrimination in Existing "Curriculum–Related" Groups

### (1) Plaintiffs Allege an Unwritten Policy Excluding "Gay–Positive Views"

Plaintiffs assert that "the evidence indicates that, both as a matter of policy and practice, students have been barred from expressing viewpoints supportive of gay people and gay experience with respect to topics that are already part of the curriculum." (Pltfs' Cross–Motion/Opp. Mem. at 36.) [36] However, the "evidence" referred to in large part consists of the May 1999 denial of the Rainbow Club application, coupled with deposition testimony concerning various witnesses' subjective understanding of the scope of District policy on the expression of "gay-positive views." Plaintiffs have not pointed to any particular incidents in which one or more of the plaintiffs attempted to express "gay-positive views" concerning the permissible sub-

---

THE COURT: Of course you don't have to worry about facts if you're dealing with a facial dispute do you?

MR. DAVIDSON: What we have to worry about [is] what is their actual policy, *there is a dispute about what the policy is ....* (Transcript of Hearing, dated April 16, 1999, at 45:22–46:20 (emphasis added).) Moreover, in their initial memorandum, counsel explained that "[p]laintiffs are not moving for summary adjudication on their First Amendment claim *because they believe a genuine issue still exists as to material facts relating to that claim....* " (Pltfs' Mem. at 1 n.1 (emphasis added).)

35. In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the non-moving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace

conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Cf. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he plaintiff could not rest on his allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint' "), quoting *First National Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand *at least one sworn averment of that fact* before the lengthy process of litigation continues. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (emphasis added).

36. *See also* Second Amended Complaint at 8 ¶ 19 (defendants have "determined that no gay-supportive expression or activity may take place within any 'curriculum-related' club, even if such a perspective is relevant to that club's topics or projects"); *id.* at 13 ¶ 35 ("Defendants allow discussion of current events, political issues and matters involving teen socialization and dating, within the forum, but prohibit expression of gay-positive viewpoints on those topics.").

ject matter of an existing curriculum-related club, but were barred from doing so by school administrators. (*See* Defs' Reply Mem. at 13.)

At the April 16th hearing, the court made inquiry concerning such incidents:

THE COURT: Well I want you to point to me to any incident in the record where she [Keysha Barnes] has been precluded from expressing an opinion.

MR. DAVIDSON: * * * *

In the Barnes' affidavit she says that she has not been allowed to have discussions about discrimination and its effects, minority role models, current political issues and in issues unique to the high school experience in the current forum.

THE COURT: ... Can you give me a time and a place and who was present?

MR. DAVIDSON: Your Honor, I don't have that in the record. What I have is a facial violation of their 1st Amendment rights, not an applied violation, a facial violation. They have a policy that says you cannot talk about gay positive viewpoints within curriculum related clubs.

Those are the only clubs that exist, you can't talk about that. That is a facial violation of the 1st Amendment. We don't need a specific incident....

\* \* \* \* \* \*

THE COURT: Well so that I can understand your argument here you're suggesting that the policy violates the First Amendment.

MR. DAVIDSON: Correct[,] Your Honor.

THE COURT: And that's as far as you go as I understand it.

MR. DAVIDSON: Other than Ms. Barnes says that she—they have not been able to—they have not—they want to have the Rainbow Club because they haven't been able to have those discussions in the existing club.

We don't in the record have more specific facts than that. At a minimum I think there is a factual dispute.

(Transcript of Hearing, dated April 16, 1999, at 40:8–42:8.)

The "policy" referred to in the colloquy with counsel must be distinguished from the written February 20, 1996 Policy adopted by the defendant Board; plaintiffs allege the existence of a broader unwritten policy prohibiting "gay positive expression by or within curriculum-related student groups." (Pltfs' Cross–Motion/Opp. Mem. at 17.) Given this unwritten policy, plaintiffs argue, *"Defendants' seemingly 'neutral' policy is merely a facade for viewpoint discrimination* in violation of the First Amendment rights" of plaintiffs. (*Id.* (emphasis in original).)

Though they argue that plaintiffs are amending their First Amendment claims as they go,[37] defendants' response does not

**37.** While Paragraph 56 of the Second Amended Complaint alleges plaintiffs' First Amendment claims in generalized terms, the plaintiffs outlined the essence of their current theory in their Motion for Leave to File Second Amended Complaint, filed February 9, 1999:

Plaintiffs have discovered that the February 20, 1996, policy at issue in this case is one of two crucial steps in Defendants' discriminatory effort. The first step is to eliminate all non-curricular clubs. This has the purpose and effect of excluding the Plaintiff East High Gay/Straight Student Alliance (the "Alliance") from being a student group that can meet within the District, an[d] effectively prohibiting any non-curricular

club that is supportive of gay people. Plaintiffs have now learned the second step: Defendants *also* interpret their own policies and/or state guidelines to prohibit expression of *any* gay-positive viewpoint within the curriculum and within any curriculum-related programs, *including* the District's "curriculum-related" student clubs. *See* Deposition Testimony of Superintendent Darline P. Robles (Jan. 29, 1999) at 102–03 (Robles' interpretation that, because of state guidelines, curriculum-related clubs cannot include "the acceptance or advocacy of homosexuality as a desirable or healthy sexual adjustment or lifestyle"); ....

(Motion for Leave to File Second Amended Complaint, filed February 9, 1999 (dkt. no. 99), at 4 (emphasis in original; additional

explicitly deny the existence of the blanket prohibition on "the expression of gay-positive viewpoints on any topics within the existing curriculum-related student groups." (Defs' Reply Mem. at 12.) [38] Instead, at the April 16th hearing, defendants' counsel argued:

MR. LARSEN: * * * *

"They have not been able to come up with any facts and I think that the court can end its inquiry because without the fact, without showing that there has been an event where they have been restricted in their speech, ... [or] there is some policy that's written that clearly prohibits that type of speech which they have not pointed to then I think they have no 1st Amendment case."

(Transcript of Hearing, dated April 16, 1999, at 47:1, 47:20–48:2.) [39] Whether plaintiffs have come forward with evidence of particular instances in which expression of their views was forbidden, or evidence of another "policy that's written" to exclude their views, presents a question different from whether the *unwritten* district policy alleged by plaintiffs actually exists. Concerning the latter, plaintiffs point to deposition testimony and affidavits they believe evidence that such an unwritten policy is tacitly understood to exist. (*See* Pltfs' Cross–Motion/Opp. Mem. at 7–8 ¶ 14; *id.* at 34–37, 43 ("according to District officials, gay-positive viewpoints are not allowed to be expressed in curriculum-

related student groups, the only student groups that remain" (footnote omitted)).)

### (2) School Authority and Student Free Expression

In making their own motion for summary judgment as to these claims, defendants postulate that "[e]ven assuming that plaintiffs' gay-positive viewpoint has been excluded from curricular student groups by the application of the district court's closed forum policy, educators may regulate expression in a curricular setting, even if such regulation is not entirely viewpoint neutral." (Defs' Mem. at 7.) Defendants submit that " 'the only limitation imposed upon school officials' pursuit of permissible objectives is that they must act reasonably when imposing restrictions on expression to achieve those objectives,' " and that "[t]here is no evidence defendants acted to the contrary in this case." (Defs' Mem. at 24) (quoting Brian S. Black, *The Public School: Beyond the Fringes of Public Forum Analysis?*, 36 Vill. L.Rev. 831, 863 (1991)).

Defendants assert an expansive "authority and responsibility" on the part of public school officials "to both educate and caretake students." (Defs' Mem. at 8.) The "school's authority can exceed the free speech rights of students," they contend, because "the student is not yet 'possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees.' " (*Id.*) (quoting *Tinker v. Des Moines Indep. Sch. Dist.*,

---

references omitted).) The defendants did not oppose the motion, and leave to amend was granted on February 11, 1999. (*See* Minute Entry, dated February 11, 1999 (dkt. no. 101).)

**38.** In their Answer to Second Amended Complaint and Jury Demand, filed February 22, 1999 (dkt. no. 104), however, defendants denied the allegations of Paragraph 56 of the Second Amended Complaint.

**39.** Counsel also pointed to a contemporaneous incident evidencing that "gay-positive viewpoints" are not wholly excluded from East High:

MR. LARSEN: * * * *

If you read the newspaper and see that at least the school principal at East High has not excluded gay positive viewpoints from all school programs and clubs and that's why 300 parents on Tuesday tried to ask for the principal's resignation because a multicultural assembly was allowed to have a short presentation on historical viewpoints from gays and lesbians.

And that is the only incident that I'm aware of where they have tried to speak and in that situation they were allowed to speak and it's a controversial issue but yet they were not restricted.
(Transcript of Hearing, dated April 16, 1999, at 47:1, 9–19.)

393 U.S. 503, 515, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (Stewart, J. concurring)[40]. Student expression may thus be restricted by schools in the name of "inculcat[ing] learning and social and political habits and mores," thereby "preparing children for meaningful lives, citizenship, and the full exercise of their constitutional rights," an assertion fraught with more than a little irony.[41] (*Id.*)

In *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Court vindicated the First Amendment right of high school and junior high school students to engage in non-disruptive expression on school premises, in particular the wearing of black armbands to protest the Vietnam War. School authorities suspended three students for wearing the armbands because they feared a disturbance would otherwise result, an action the district court found to be reasonable. The Court disagreed:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, ... and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

**40.** Citing to *Tinker* without further attribution, defendants in fact quote the above language from Justice Stewart's concurring opinion in that case. The complete sentence reads:

> "[A] State may permissibly determine that, at least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees."

393 U.S. at 515, 89 S.Ct. 733 (citations omitted). This was a verbatim reiteration of an observation Justice Stewart made a year earlier in his separate concurrence in *Ginsberg v. New York*, 390 U.S. 629, 649–50, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), affirming a defendant's conviction for selling "girlie" magazines to a 16–year old boy in violation of a New York statute. While Justice Stewart could not "share the Court's uncritical assumption that, school discipline aside, the First Amendment rights of children are co-extensive with those of adults," 393 U.S. at 515, 89 S.Ct. 733, he did not hesitate six years earlier to vacate the breach-of-the-peace convictions of a group of high school and college students who had assembled on the South Carolina State House grounds to "peaceably express[ ] their grievances" concerning discrimination. *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) Describing the assembly as an exercise of First Amendment rights "in their most pris-tine and classic form," Justice Stewart, writing for the Court, found that the young people had been "convicted upon evidence which showed no more than that the opinions which they were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection." 372 U.S. at 237, 83 S.Ct. 680. "The Fourteenth Amendment does not permit a State to make criminal the peaceful expression of unpopular views," even when that expression " 'stirred people to anger, invited public dispute, or brought about a condition of unrest. A conviction resting on any of those grounds may not stand.' " *Id.* (quoting *Terminiello v. Chicago*, 337 U.S. 1, 5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)). Nothing in *Edwards* even hinted that the high school students in the assembly had any lesser right to speak than anyone else.

**41.** As the Supreme Court observed in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), schools have "important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."

393 U.S. at 508–09, 89 S.Ct. 733 (citation omitted).

*Tinker* delimited school officials' authority to restrict student expression as follows:

> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained.

*Id.* at 509, 89 S.Ct. 733 (citing *Burnside v. Byars,* 363 F.2d 744, 749 (5th Cir.1966)). Concerning viewpoint discrimination, the Court elaborated: "Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Id.* at 511, 89 S.Ct. 733.

Under *Tinker,* then, defendants acknowledge that a student " 'may express his opinions ... if he does so without materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others.' " (Defs' Mem. at 10 (quoting *Tinker,* 393 U.S. at 513, 89 S.Ct. 733.) Defendants, however, read a handful of more recent cases to signal a retreat from *Tinker*'s powerful affirmation of students' rights to free expression of their views.

*Bethel School District No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), upheld a school's suspension of a student for giving a "sexually explicit" nominating speech at a high school assembly because the school was entitled to "disassociate itself" from the speech in a manner that would demonstrate to others that such vulgarity is "wholly inconsistent with the 'fundamental values' of public school education." 478 U.S. at 685–86, 106 S.Ct. 3159. The *Fraser* Court explained that "[t]he determination of what *manner* of speech in the classroom or in school assembly is inappropriate properly rests with the school board," *id.* at 683, 106 S.Ct. 3159 (emphasis added), rather than the federal courts, recognizing "the obvious concern on the part of parents, and school authorities acting in loco parentis, to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech." *Id.* at 684, 106 S.Ct. 3159.

Examined carefully, *Fraser* does not diminish *Tinker*'s protection of a student's right to express an unpopular view. Indeed, the Court points out that "the penalties imposed in this case were unrelated to any political viewpoint." *Id.* at 685, 106 S.Ct. 3159. Rather, *Fraser* addresses the *manner* in which that view may be expressed. Had the speaker in *Fraser* chosen a form other than sexually suggestive double entendres for his remarks, the school's "interest in protecting minors from exposure to vulgar and offensive spoken language," *id.* at 684, 106 S.Ct. 3159, would not have been implicated. "Nothing in the Constitution," wrote the Chief Justice, "prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions." *Id.* at 683, 106 S.Ct. 3159.[42]

Thus, *Fraser* speaks to the form and manner of student speech, not its substance. It addresses the mode of expression, not its content or viewpoint. Rather than limiting or abandoning *Tinker, Fraser* simply distinguishes it.

---

**42.** Pointing to rules of the United States Senate and House of Representatives prohibiting "impertinent," "indecent" or other offensive speech in proceedings, *Fraser* asks, "Can it be that what is proscribed in the halls of Congress is beyond the reach of school officials to regulate?" *Id.* at 682, 106 S.Ct. 3159.

Likewise, *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), also relied on by the defendants, distinguishes *Tinker* rather than retreating from its principles. In *Hazelwood*, the Court affirmed the authority of school administrators to censor the content of an officially sponsored high school student newspaper so long as the censorship is "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273, 108 S.Ct. 562.

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.

*Id.* at 270–71, 108 S.Ct. 562. "These activities," the Court continued, "may fairly be characterized *as part of the school curriculum*, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* at 271, 108 S.Ct. 562 (emphasis added).

> Hence, a school may in its capacity *as publisher of a school newspaper or producer of a school play* "disassociate itself" ... not only from speech that would "substantially interfere with [its] work ... or impinge upon the rights of other students," *Tinker*, ... but also from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or preju-

diced, vulgar or profane, or unsuitable for immature audiences. As school must be able to set high standards for the student speech *that is disseminated under its auspices* . . . .

*Id.* at 271–72, 108 S.Ct. 562 (emphasis added; citations & footnote omitted).

The defendants read *Hazelwood* to make "a crucial distinction between school-sponsored speech and school-tolerated speech" and to restrict *Tinker* to "school-tolerated speech, defined as 'a student's personal expression that happens to occur on the school premises, ...'" (Defs' Mem. at 12 (quoting *Hazelwood*, 484 U.S. at 271, 108 S.Ct. 562).) Defendants further assert that "there is a clear overlap with curriculum-related student groups meeting under a closed forum equal access policy in that school sponsored speech includes any activity, inside or outside a traditional classroom setting, that is supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." (*Id.* at 13.)

At this point, this court declines to adopt defendants' suggestion that by establishing a limited public or nonpublic forum for "curriculum-related" student clubs, a school thereby "lends its name and resources to the dissemination of student speech" and converts "school-tolerated" student expression within that forum under *Tinker* into "school-sponsored speech" under *Hazelwood*. Allowing a student group to meet on school premises during non-instructional time does not equate with publishing a school newspaper or producing a school play as part of the school's language arts curriculum, and does not affirmatively promote particular student speech. Group meetings and group activities are a group function, a club function. Students, parents, and members of the public likely will not perceive student club and group activities as being a *school* function, or as "bearing the imprimatur of the

school." [43] (*Cf.* Deposition of Darline P. Robles, dated January 29, 1999, at 81:6–83:16.)

Beyond *Hazelwood,* defendants' analysis blurs the distinction between the power and discretion of school officials to select appropriate subject matter and materials to be taught in the school's curriculum and the relatively limited power of school officials to restrict or proscribe student expression of student views. That educators may have "broad discretion to regulate expression in a curricular setting," (Defs' Mem. at 24),[44] does not translate into broad discretion to regulate student expression in the context of student clubs and groups meeting on school premises during non-instructional time, or to discriminate against or exclude a particular student viewpoint from an existing forum allowing for "school-tolerated" student expression.

Defendants' designation of the permissible subject matter of the forum is properly measured by its reasonableness. Any effort by defendants to exclude a particular viewpoint or a particular speaker otherwise within that subject matter is not; such an exclusion calls for strict scrutiny. *Forbes,* 523 U.S. at 677, 118 S.Ct. 1633. In the context of public secondary schools, "the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline," or to avoid "colliding with the rights of others," the Court has said,

"is not constitutionally permissible." *Tinker,* 393 U.S. at 511, 513, 89 S.Ct. 733.

### (3) The Pending Motions for Summary Judgment

 Defendants thus fail to demonstrate their entitlement to judgment as a matter of law on the ground that "[e]ven assuming that plaintiffs' gay-positive viewpoint has been excluded from curricular student groups," the defendants "may regulate expression in a curricular setting, even if such regulation is not entirely viewpoint neutral," (Defs' Mem. at 7), and that plaintiffs' exclusion from the forum therefore does not run afoul of the First and Fourteenth Amendments.

Plaintiffs have also failed to carry their initial burden to show the absence of a genuine issue of material fact and their entitlement to judgment as a matter of law concerning the existence of the unwritten blanket prohibition on "gay-positive viewpoints" that their cross-motion now alleges exists. Nevertheless, the deposition testimony and affidavit averments that plaintiffs point to [45] may well raise a genuine issue of material fact as to the existence of this asserted separate and broader unwritten "policy" justifying the denial of defendants' motion for summary judgment as to plaintiffs' First Amendment claims. Whether a genuine triable issue exists concerning the alleged unwritten policy prohibiting all expression of "gay-positive viewpoints" seems to be a question that

---

**43.** *National Endowment for the Arts v. Finley,* 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998), discussed at pages 19–20 of defendants' initial memorandum, offers little useful guidance here because, unlike plaintiffs in *Finley,* the plaintiffs in this case do not seek a government subsidy for their expression; they only seek access to an existing forum from which they claim to be excluded. *See also Rust v. Sullivan,* 500 U.S. 173 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("The Government can ... selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program.").

**44.** *Board of Education, Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion), and *Zykan v. Warsaw Community Sch. Corp.,* 631 F.2d 1300 (7th Cir.1980), cited by defendants, do not concern the restriction of student speech; each involves a challenge to school officials' decisions to remove certain books from a school library, or to remove specific books, materials, and courses from the school curriculum, and not to rehire specific teachers.

**45.** (*See* Pltfs' Cross–Motion/Opp. Mem. at 7–8 ¶ 14; *id.* at 34–37.)

should be addressed in this proceeding other than by summary judgment motion.

### C. The Rainbow Club

As noted above, plaintiffs' cross-motion for summary judgment seeks to interject into this proceeding the recent application for, and denial of, District approval of a student group to be called the Rainbow Club, whose subject matter was to include the "impact, contribution and importance of gay, lesbian, bi-sexual, and transgender individuals." Plaintiffs' memorandum details the application made by the Rainbow Club for approval as a "curriculum-related" student group under the February 20, 1996 Policy. (Pltfs' Cross–Motion/Opp. Mem. at 21–27.) Their Supplemental Memorandum in Support of Plaintiffs' Motions for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment, filed May 21, 1999 (dkt. no. 128) ("Pltfs' Supp. Mem."), together with the accompanying Declaration of Stephen C. Clark (dkt. no. 129), detail the Rainbow Club's efforts to win approval to meet at East High School and document the denial of that application by Assistant Superintendent Cynthia Seidel on May 10, 1999. By letter of that date addressed to Camille Lee, the Rainbow Club's faculty sponsor at East High School, defendant Seidel detailed her reasons for denying approval to the Rainbow Club: "First, the subject matter of the club is not actually taught and will not soon be taught in a regular course offered at East High School.... Second, the subject matter of the proposed club, sexual orientation, does not concern the body of courses as a whole." (Exhibit "A" to the Declaration of Stephen C. Clark.) Ms. Seidel thus did not discern a direct relationship between the proposed club and the curriculum that would satisfy the *Mergens* criteria.

Ms. Seidel, however, continued:

For your information, even if the Rainbow Club were somehow curriculum-related, I would still deny the application. In my opinion, as a professional educator, sexual orientation is not the proper organizing subject matter of a curriculum-related club. First, education regarding human sexuality is strictly regulated in this state and in the District. Second, current Utah law precludes any club that involves human sexuality, Utah Code Ann. § 53A–3–419.[46] Third, as evidenced by recent events related to the multi-cultural assembly, a curricular club related to sexual orientation will cause significant disruption at East High School. Finally, I do not believe that a student club regarding sexual orientation is age appropriate for all of the students at East High School.

(*Id.*)

In their Supplemental Memorandum, plaintiffs retort: "At the April 16, 1999 argument, the Court pressed Plaintiffs to identify instances where they sought to express gay-positive viewpoints in the existing forum for curriculum-related student groups and were precluded from doing so. Defendant Seidel's May 10, 1999 letter does just that." (Pltfs' Supp. Mem. at 3.) The letter, plaintiffs insist, "presents clear evidence that Defendants are unlawfully preventing the expression of gay-positive viewpoints on the curriculum-related subjects that are clearly includible in the curriculum-related student group forum." (*Id.*)

---

**46.** Utah Code Ann. § 53A–3–419(2)(a) reads in part:

The Legislature finds that certain activities, programs, and conduct are so detrimental to the physical, emotional, psychological, and moral well being of students and faculty, the maintenance of order and discipline on school premises, and the prevention of any material and substantial interference with the orderly conduct of a school's educational activities, that local school boards shall deny access to any student organization or club whose program or activities would materially and substantially:

(I) encourage criminal or delinquent conduct;

(ii) promote bigotry; or

(iii) involve human sexuality.

For their part, defendants object that plaintiffs' allegations concerning the Rainbow Club's application fall outside the scope of the claims pleaded in the Second Amended Complaint. (Defs' Resp. to Supp. Mem. at 1–2.)

The court agrees that the Second Amended Complaint makes no explicit reference to the Rainbow Club, or to the application for approval made on its behalf. As the court observed at the close of the April 16, 1996 hearing, "the Rainbow car wasn't on the train when it left the station and is not part of this lawsuit." (Transcript of Hearing, dated April 16, 1999, at 67:9–10.)

However, as set forth above, Paragraph 56 of the Second Amended Complaint does allege that defendants have engaged in impermissible viewpoint discrimination "by impermissibly discriminating on the basis of content and viewpoint, even within the activities of approved 'curriculum-related' clubs; by adopting policies and rules that dictate that no student group activity can include a gay-positive viewpoint; [and] by failing to establish and apply clear and consistent, content- and viewpoint-neutral criteria for determining which student groups will be allowed to use the limited public forum . . . ." (Second Amended Complaint at ¶ 56.)

Ms. Seidel's May 10th letter may be read to suggest that there exists at least the perception that "no student group activity can include a gay-positive viewpoint." Thus, plaintiffs' First Amendment claims as pleaded in their Second Amended Complaint, the filing of which was not objected to by the defendants, raise a factual question incapable of resolution at this stage of the proceeding.

## VII

The core disputed factual question—really the *only* factual question—which remains is *whether an unwritten policy exists that prohibits plaintiffs from expressing their viewpoint on matters ger-* *mane to the permissible subject matter of the existing forum for "curriculum-related" student groups.* If such a policy exists, the legal question remains whether it violates the First and Fourteenth Amendments. The questions otherwise raised by motion have been determined by the rulings of the court as set forth above.

## Conclusion

Plaintiffs sought summary judgment that defendants "had and continue to have a 'limited open forum'" under the Equal Access Act at both East High School and West High School, and that defendants "have unlawfully denied Plaintiffs access to that forum" contrary to that Act. (Plaintiffs' Motion for Partial Summary Judgment at 1.) As to the 1997–98 school year at East High School (during the time that the Improvement Council at East met on school premises during non-instructional time), plaintiffs' motion for partial summary judgment is granted; otherwise, plaintiffs' motion must be denied.

Defendants sought summary judgment (1) that the Salt Lake City School District "adopted, implemented and maintained a closed forum policy in compliance with the Equal Access Act, thus allowing only curricular related student groups to meet . . . on school premises during instructional time;" and (2) that the District's policy "on its face and as applied does not constitute . . . viewpoint discrimination under the First and Fourteenth Amendments." (Defendants' Motion for Summary Judgment at 1.) With the exception of the 1997–98 school year at East High School (during the time that the Improvement Council at East met on school premises during non-instructional time), summary judgment is granted in favor of the defendants that the District has adopted and maintained a closed forum under the Equal Access Act and that a "limited open forum" as defined by the Act does not now exist at either

East High School or West High School.[47] Summary judgment is also granted in favor of the defendants to the extent that on its face, the defendants' February 20, 1996 Policy represents a content-based restriction that is reasonable in light of the purpose served by the forum for student groups at East High School and West High School. Establishing a forum for "curriculum-related" student groups consistent with the Equal Access Act does not by itself violate the First and Fourteenth Amendments. Defendants' summary judgment motion must otherwise be denied.

Plaintiffs' cross-motion for partial summary judgment must also be denied because there remains a genuine issue of material fact concerning whether an unwritten policy exists barring plaintiffs from expressing their viewpoint on matters germane to the permissible subject matter of the defendants' existing forum for "curriculum-related" student groups.

For the reasons set forth above,

**IT IS ORDERED** that plaintiffs' Motion for Partial Summary Judgment (dkt. no. 110) is GRANTED to the extent that plaintiffs were unlawfully denied access to the "limited open forum" under the Equal Access Act, 20 U.S.C. § 4071, that existed at East High School during the 1997–98 school year; in all other respects, plaintiffs' motion is DENIED;

**IT IS FURTHER ORDERED** that defendants' Motion for Summary Judgment (dkt. no. 108) is GRANTED to the extent that pursuant to the February 20, 1996 Policy, the District has maintained a closed forum under the Equal Access Act, 20 U.S.C. § 4071, and that a "limited open forum" as defined by the Act does not now exist at either East High School or West High School; with respect to the 1997–98 school year at East High School, summary judgment under the Equal Access Act is DENIED; summary judgment is also GRANTED in favor of the defendants to the extent that on its face, the defendants' February 20, 1996 Policy represents a content-based restriction that is reasonable in light of the purpose served by the forum for student groups at East High School and West High School. Defendants' summary judgment motion must otherwise be DENIED.

**IT IS FURTHER ORDERED** that plaintiffs' Cross Motion for Partial Summary Judgment on Their First Amendment Claims (dkt. no. 118) is DENIED because of plaintiffs' failure to carry their initial burden to "show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c); and

**IT IS FURTHER ORDERED** that the two remaining questions to be resolved in this case are set for hearing at a Pretrial Conference on the 5th day of November, 1999, at 1:45 p.m. Counsel for plaintiffs and defendants shall submit a suggested form of Pretrial Order signed by each of the attorneys with a roster of witnesses and exhibits, if any, and shall do so by November 3, 1999. At the Pretrial Conference, counsel should be prepared as to the two remaining questions to talk theory, to talk authority and to talk facts.

---

**47.** This ruling does not decide whether any existing student groups other than the five groups identified by plaintiffs in this proceeding are "curriculum-related" or "non-curricular" under the Equal Access Act. At this point, the other 76 approved groups are simply not before the court.